# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| RYAN SCOTT, individually and on behalf of all others similarly situated,<br><br>                    Plaintiff,<br><br>      v.<br><br>FORD MOTOR COMPANY,<br><br>                    Defendant. | Case No. 3:22-cv-50352<br><br>Jury Trial Demanded |

## CLASS ACTION COMPLAINT

**TABLE OF CONTENTS**

I.     INTRODUCTION ......................................................................................... 1

II.    JURISDICTION AND VENUE .................................................................... 3

III.   PARTIES ...................................................................................................... 4

    A.   Plaintiff ................................................................................................. 4

    B.   Defendant ............................................................................................. 5

IV.    SUBSTANTIVE ALLEGATIONS .............................................................. 5

    A.   Ford markets its vehicles as safe and "Built Ford Tough." ............... 5

    B.   Rollover accidents are a leading cause of vehicle fatalities. ........... 11

    C.   Ford's Super Duty Roof Defect. ....................................................... 13

    D.   Ford knew that the Class Vehicles suffered from the Roof Defect prior to
         its sale of the Class Vehicles. .......................................................... 20

    E.   Ford has yet to recall the Class Vehicles and warn drivers of the Roof
         Defect. ............................................................................................... 27

V.     TOLLING OF STATUTES OF LIMITATIONS ....................................... 28

    A.   Discovery Rule .................................................................................. 28

    B.   Fraudulent Concealment ................................................................... 29

    C.   Estoppel ............................................................................................. 30

VI.    CLASS ALLEGATIONS ........................................................................... 30

VII.   CAUSES OF ACTION ............................................................................... 34

        VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT .................... 34

        FRAUDULENT CONCEALMENT ........................................................ 37

        UNJUST ENRICHMENT .................................................................... 40

        BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
        (UCC § 2-314) ................................................................................. 41

BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(810 ILL. COMP. STAT. 5/2-314, 810 ILL. COMP. STAT. 5/2A-212) ......................... 43

VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACTCONSUMER FRAUDS ACT ................... 46

VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND
DECEPTIVE BUSINESS PRACTICES ACT .................................................................. 47

VIII. REQUEST FOR RELIEF ................................................................................................. 49

IX. DEMAND FOR JURY TRIAL ......................................................................................... 50

Plaintiff Ryan Scott ("Plaintiff"), individually and on behalf of all those similarly situated, complains of Defendant Ford Motor Company ("Ford" or "Defendant"), based upon his personal knowledge as to facts specific to him and based upon the investigation of counsel in all other respects, as follows:

## I.    INTRODUCTION

1.     An automobile purchase is one of the most expensive and important decisions consumers make. Consumers rely upon automakers' superior knowledge to manufacture and sell cars that are safe and free from defects. Ford markets itself as the "pioneer [of] auto safety" and readily admits that "safety is a crucial automotive attribute[.]"[1] Should a manufacturer or distributor learn of any safety defects in its vehicles, it is imperative and a legal requirement for it to immediately warn the public.

2.     Despite this important duty, for nearly two decades, Ford knowingly sold 5.2 million Class Vehicles[2] which it knew possessed a safety defect that creates a serious risk of grave physical injury and death to passengers. In particular, the Class Vehicles contain patently insufficient, weak roof structures (primarily, comprised of two or three support pillars) that are highly susceptible to collapse upon a rollover accident (the "Roof Defect").

3.     The weakness in the Class Vehicles' roof structures is the result of Ford's reckless pursuit to reduce costs at the expense of its customers' safety. Much like Ford's decision in the 1970s to exclude vital and inexpensive safety components in the Ford Pinto in order to maximize its profits, from the time Ford first developed the Class Vehicles and continuing through

---

[1] https://corporate.ford.com/articles/history/ford-pioneers-auto-safety.html (last accessed Sept. 28, 2022).

[2] The Class Vehicles are 1999-2016 Ford Super Duty vehicles, including the F-250, F-350, F-450 and F-550, that contain the PHN 131 design platform.

production of the Class Vehicles, Ford continued to reduce the strength of the Class Vehicles' roof structures for the sake of maximizing profits.

4.      Ford intentionally "downgage[d]" and reduced the strength of various roof structural components found in the Class Vehicles, without conducting any test to determine whether such changes would impact passenger safety. Instead, Ford was solely focused on extracting additional profits from the vehicles. Ford's efforts to reduce its cost to produce a Class Vehicle by approximately $28 created the Roof Defect and has resulted in the needless death of passengers.

5.      While the existence of the Roof Defect was known to Ford for years (through, *inter alia*, pre-sale testing, warranty claims, and wrongful death lawsuits resulting in confidential settlements), the existence of the Roof Defect did not become common knowledge until it fell under national scrutiny on August 19, 2022, after a jury in Georgia awarded the family of two passengers killed in a Class Vehicle rollover accident $1.7 billion in punitive damages.

6.      To date, Ford continues to deny the existence of the Roof Defect and has failed to inform Class Vehicle drivers that their vehicles pose a serious risk to their safety and mortality. Nor has Ford offered any repair for the Roof Defect or offered Class Vehicle owners reimbursement for out-of-pocket expenses, loss of use, and loss of value.

7.      Ford's marketing of its vehicles as safe and reliable is pervasive across the United States, and practically unavoidable. Who in the United States is not familiar with Ford's slogan: "Built Ford Tough"?

8.      Had Plaintiff and other Class Members known of the Roof Defect at the time of purchase or lease, they would not have bought or leased the Class Vehicles or would have paid substantially less for them.

2

9.     As a result of Defendant's breaches of warranties, and unfair, deceptive, and/or fraudulent business practices, owners and/or lessees of the Class Vehicles, including Plaintiff, have suffered an ascertainable loss of money and/or property and/or loss in value. The unfair and deceptive trade practices committed by Defendant caused Plaintiff and the members of the Class damages, including but not limited to, loss of value, loss of use of the vehicles, and repair costs.

10.     Accordingly, Plaintiff brings this action to redress Defendant's misconduct. Plaintiff seeks damages and a repair under the Magnuson-Moss Warranty Act, 15 U.S.C. §§ 23-1-2312, state consumer protection acts, state implied warranty acts, and unjust enrichment and fraudulent concealment at common law.

## II.     JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction under the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) and (6), because: (a) there are 100 or more class members; (b) there is an aggregate amount in controversy exceeding $5,000,000.00 exclusive of interest and costs; and (c) there is minimal diversity because at least one plaintiff and one defendant are citizens of different states.

12.     This Court has personal jurisdiction over Defendant by virtue of its transactions and business conducted in this judicial district. Defendant has transacted and done business and violated statutory and common law in the State of Illinois and in this District.

13.     Venue is proper in this judicial district under 28 U.S.C. §1391 because Defendant transacts substantial business in this District. Defendant advertised in this District and received substantial revenue and profits from sales and/or leases of the Class Vehicles in this District. Therefore, a substantial part of the events and/or omissions giving rise to the claims occurred, in part, within this District.

### III.    PARTIES

#### A.  Plaintiff

14.    Plaintiff Ryan Scott is a citizen of Illinois and resides in Dekalb, Illinois. Plaintiff purchased a 2011 Ford Super Duty F-350 from a private seller in Illinois.

15.    When shopping for his Class Vehicle, Plaintiff researched and considered the safety, reliability and quality of the make and manufacturer. Prior to purchasing his Class Vehicle, Plaintiff reviewed Ford's marketing materials and specifications for the Class Vehicles posted on Ford's website, third-party websites, and located at Ford dealerships in Illinois—each of which failed to disclose the presence of the Roof Defect in the Class Vehicle.

16.    Through his exposure and interaction with Ford, Plaintiff was aware of Ford's uniform and nationwide marketing message that its vehicles are safe and dependable, which was material to his decision to purchase his Class Vehicle. When he purchased the vehicle, he believed, based on Ford's marketing message, that he would be in a safe and dependable vehicle, one that is safer than a vehicle that is not marketed as safe and dependable. At no point before Plaintiff purchased his vehicle did Ford disclose to him that his vehicle was not safe or dependable, or that it suffered from the Roof Defect, which creates safety risks.

17.    Plaintiff purchased his Class Vehicle with the Roof Defect as part of a transaction in which Ford did not disclose material facts related to the automobile's essential purpose—safe and dependable transportation. Plaintiff did not receive the benefit of his bargain. He purchased a vehicle that is of a lesser standard, grade, and quality than represented, and he did not receive a vehicle that met ordinary and reasonable consumer expectations regarding safe and reliable operation. The Roof Defect has significantly diminished the value of Plaintiff's Class Vehicle.

18.    Had Ford disclosed the Roof Defect, Plaintiff would not have purchased his Class Vehicle, or would have paid less to do so.

4

19.     Plaintiff would purchase a Ford from Ford in the future if Defendant's representations about the vehicle, including its safety and durability, were accurate.

**B. Defendant**

20.     Defendant Ford Motor Company is a corporation organized and in existence under the laws of the State of Delaware and maintains its Corporate Headquarters at 1 American Road, Dearborn, Michigan 48126. Ford designs and manufactures motor vehicles, parts, and other products for sale in the United States and throughout the world. Ford Motor Company is the warrantor and distributor of the Class Vehicles.

21.     At all relevant times, Defendant was and is engaged in the business of designing, manufacturing, constructing, assembling, marketing, distributing, and/or selling automobiles and motor vehicle components throughout the United States.

**IV.     SUBSTANTIVE ALLEGATIONS**

**A. Ford markets its vehicles as safe and "Built Ford Tough."**

22.     Founded by Henry Ford in 1903, Ford is one of the oldest and most distinguished automobile manufacturers across the globe. Ford is the second largest automaker in the U.S. and the fifth largest in the world based on annual vehicle sales in 2010.[3]

23.     The first F-series, the Ford F1, was introduced by Ford in January 1948.[4] The F-Series is now comprised of the F-150, F-250, F-350, F-450, F-550, F-650 and F-750 models.

---

[3] https://www.automotive-fleet.com/encyclopedia/ford-motor-company#:~:text=Ford%20Motor%20Company%20is%20an,annual%20vehicle%20sales%20in%202010 (last accessed Sept. 28, 2022).

[4] https://hedgescompany.com/blog/2019/11/most-popular-trucks-in-america/#:~:text=The%20Ford%20F%2DSeries%20has,700%2C000%20unit%20sales%20in%202021 (last accessed Sept. 28, 2022).

24.     Ford's F-250, F-350, F-450, and F-550 models fall within its F-Series Super Duty line of heavy-duty trucks. The Super Duty line of vehicles was introduced in Ford's 1999 model year vehicles.

25.     Ford's F-Series of trucks has been best-selling truck in the United States for more than 44 years.[5]   The success of the F-Series is founded upon Ford's uniform and consistent marketing messaging that its vehicles are safe, durable, and of the highest quality. Indeed, nearly every American can repeat Ford's slogan: "Built Ford Tough."[6]

26.     Ford represents that "[o]ver the last century, [it] has designed vehicles with the customer at the center and manufactured safe, quality vehicles at high volumes to meet the needs of people all over the world."[7]

27.     For example, in July 2015, Ford released a promotional video titled "Quality Is The Bedrock Of Everything Ford Builds[,]" in which it touts its advanced manufacturing technology and systems.[8]

---

[5] *Id*.

[6] https://corporate.ford.com/about/culture/built-ford-tough.html (last accessed Sept. 28, 2022).

[7] Ford Safety Report, June 2021, available at https://media.ford.com/content/dam/fordmedia/North%20America/US/2021/06/17/ford-safety-report.pdf (last accessed Sept. 28, 2022).

[8] https://web.archive.org/web/20150911233057/https://media.ford.com/content/fordmedia/fna/us/en/asset.html/content/dam/fordmedia/North%20America/US/2015/03/labor/mp4/quality-is-the-bedrock-of-everything-ford-builds.mp4.html July 16, 2015, "QUALITY IS THE BEDROCK OF EVERYTHING FORD BUILDS" (last accessed Sept. 28, 2022).

28.     For years, Ford touted its vehicles as "QUALITY, GREEN, SAFE AND SMART," including in its brochures for the Class Vehicles, model years 2009,[9] 2012,[10] 2013,[11] and 2014.[12] In Ford's brochure for 2009 Class Vehicles, the company explained what "Quality, Green, Safe and Smart" means:

> QUALITY TRUCKS.
>
> F-Series trucks have a reputation for quality that has made them America's best-selling line of trucks for 31 years in a row.
>
> GREEN TRUCKS.
>
> The optional 6.4L Power Stroke® Turbo Diesel runs on UltraLow-Sulfur Diesel to help reduce particulate and greenhouse gas emissions.
>
> SAFE TRUCKS.
>
> Safety features include 4-wheel ABS brakes, front airbags, safety belt energy management retractors and side-intrusion door beams.
>
> SMART TRUCKS.
>
> The new Ford Work SolutionsTM options bring you high technology and productivity tools that help get the job done.

---

[9] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2009.pdf (last accessed Sept. 28, 2022).

[10] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2012.pdf (last accessed Sept. 28, 2022).

[11] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2013.pdf (last accessed Sept. 28, 2022).

[12] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2014.pdf (last accessed Sept. 28, 2022).

29.     When Ford released the first Class Vehicles (model year 1999), Ford touted the vehicles' design and quality in its marketing brochures: [13]



*It all begins with the foundation. Without a solid, well-conceived and well-engineered chassis, there's simply no truck. The Ford Super Duty chassis combines innovative features with rugged, time-proven construction to create the perfect platform for commercial and heavy-duty personal use. And all Super Duty F-Series models have the largest pickup box by volume in their class.*

30.     Similarly, when releasing the 2008 Super Duty models, Ford states that each Class Vehicle is designed to be the toughest trucks in the market:[14]

31.     Ford goes on to tout the durability and safety of the Class Vehicles:

## TOUGH MOVES MOUNTAINS

Since the concept of heavy-duty trucks took shape at Ford, F-Series Super Duty pickups have had one mission: to be the toughest, most capable pickups in the nation. So every vehicle system is designed toward the goal of effortlessly hauling the biggest payloads and towing the heaviest trailers, while maintaining optimum control of those huge loads. And now, the mighty new F-450 pickup is the most capable Super Duty of them all.

---

[13] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_1999.pdf (last accessed Sept. 28, 2022).

[14] https://www.xr793.com/wp-content/uploads/2016/10/2008-Ford-Super-Duty.pdf (last accessed Sept. 28, 2022).

## TOUGH DON'T NEED NO ROAD

When we say F-Series Super Duty is a go-anywhere truck, we aren't kidding. With standard 4-wheel drive, limited-slip rear differential, Rancho® branded shocks, plus transfer case and fuel tank skid plates, the new FX4 OFF-ROAD comes rigged with all the right gear for 4-wheeling. And when your adventure is done, you'll head for town in one of the most well-appointed, comfortable pickups on the road.

32.    Ford also touted the safety features that come standard in the Class Vehicles:

**STANDARD FEATURES**

| SAFETY/SECURITY |
| --- |
| 4-wheel power disc brakes with Anti-lock Brake System (ABS) |
| Airbags* — Driver and right-front passenger |
| Alert chimes — Headlamps-on, key-in-ignition and door ajar |
| Belt-Minder® safety belt reminder |
| Brake/shift interlock (with automatic transmission) |
| Child-safety seat top tether anchors (Regular Cab front passenger and all rear seating positions) |
| Fuel pump inertia shutoff switch |
| Height-adjustable safety belts — Front outboard |
| Locking tailgate |
| Passenger airbag deactivation switch (Regular Cab, SuperCab) |
| Safety belt energy-management retractors — Front outboard positions |
| Side-intrusion door beams |
| Spare tire/wheel lock |

33.    In its brochure for the 2011 Super Duty Class Vehicles, Ford represents that the "Super Duty is built to the extremely high standards of durability and reliability you'd expect in a full-size pickup that's Built Ford Tough."[15] Ford further states that the 2011 Super Duty, "AMERICA'S MOST CAPABLE PICKUP TRUCK[,] is now even better." Among other things, Ford states that "[t]he new 2011 Super Duty® endured more torture testing than any Ford Truck before it – including over 10 million cumulative miles…. A world-class team put it through a groundbreaking battery of computer simulations, lab and real-world tests – running it for

---

[15] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2011.pdf  (last accessed Sept. 28, 2022).

THOUSANDS OF HOURS ON END." Ford also touts the safety and durability of the vehicles, telling consumers "STRENGTH you can COUNT ON" and "TOUGHNESS you can TRUST … you can rest assured the new 2011 Super Duty® is built on a solid foundation, one that's designed to meet most any challenge and conquer most any terrain." Moreover, Ford touted the safety of the vehicle, including in its "Standard Safety Canopy® System" for rollover incidents.

34.     Ford repeated many of these statements in each of its marketing brochures for the Class Vehicles. For instance, in its brochure for the 2015 Super Duty Class Vehicles, Ford states "TOUGH KEEPS GETTING TOUGHER. The 2015 Ford F-Series Super Duty is setting the standard for other heavy-duty pickups to follow. Yet again. From increased capabilities to improved power and performance to beefier underpinnings and beyond, this Super Duty takes Built Ford Tough® to new extremes, so you can get more work done than ever before."[16]

35.     In its brochure for 2010 Class Vehicles, Ford states that NO other Truck COMPARES[.] Super Duty® rewrites the rules for capability and comfort with top-quality materials and refinement."[17]

36.     While Ford currently promotes its dedication to quality, the manufacturer has a checkered past when it comes to putting the safety of its customers first. Most notably, from 1971 to 1976, Ford marketed and sold over three million Pinto vehicles which had an undisclosed defect that resulted in deadly fuel tank fires. It eventually came to light that Ford secretly crash-tested the Pinto more than forty times before it sold any of the vehicles and that the Pinto's fuel tank ruptured

---

[16] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2015.pdf (last accessed Sept. 28, 2022).

[17] https://www.auto-brochures.com/makes/Ford/SuperDuty/Ford_US%20SuperDuty_2010.pdf (last accessed Sept. 28, 2022).

in every test performed at speeds over twenty-five miles per hour.[18] Rather than installing solutions that would cost between $1 to $8 per vehicle, Ford decided to sell the vehicles without fixing the defect.

37.     As Pinto lawsuits began to pile up, Ford made the calculated decision that it would be more profitable to settle the lawsuits on an *ad hoc* basis than it would be to remedy the Pinto vehicles and save lives.[19] It is estimated that between 500 and 900 burn deaths are attributable to Pinto crashes caused by the defect. Ford's handling of the Ford Pinto has now become a case study in tort law and business ethics. Sadly, as shown below, Ford has not learned much from the Pinto catastrophe.

**B. Rollover accidents are a leading cause of vehicle fatalities.**

38.     "[R]ollover crashes pose a serious threat to vehicle occupants" and are one of the leading causes of fatalities.[20] From 2014 to 2018, rollover crashes accounted for approximately 2 percent of all vehicle crashes, yet rollover accidents were responsible for 24 percent of all fatalities. In 2017, there were a total of 23,551 passenger vehicle fatalities, of which 7,170 fatalities, over 30% of all deaths, involved rollover incidents.

39.     Although multiple factors may impact a passenger's chances of survival during a rollover accident, such as whether the seat belt is worn, the National Highway Traffic Safety Administration ("NHTSA") has recognized that "the effectiveness [of such safety features] could

---

[18] https://www.tortmuseum.org/ford-pinto/ (last accessed Sept. 28, 2022).

[19] *Id.*

[20] NHTSA, Evaluation of FMVSS No. 216a, Roof Crush Resistance, Upgraded Standard, November 2020, available at
https://crashstats.nhtsa.dot.gov/Api/Public/Publication/813027#:~:text=216a-
,FMVSS%20No.,threshold%20specified%20in%20FMVSS%20No.

be diminished if an occupant's survival space is not adequately maintained during a rollover."[21] NHTSA went on to note that "even if all passengers properly fasten seat belts, their chances of surviving or sustaining less severe injury in rollover crashes would be improved if their vehicles properly maintain occupant compartment integrity."

40.     First going into effect in 1973, Federal Motor Vehicle Safety Standard ("FMVSS") 216 is a federal standard that applies to roof crush loads for passenger vehicles. *See* 49 C.F.R. Part 571.216. The standard calls for passenger compartment roofs to have sufficient strength to resist deformation beyond a certain degree when a force of one and one-half times the vehicle weight is applied using a specified test device.

41.     The purpose of the standard is obvious: "to reduce deaths and injuries due to the crushing of the roof into the passenger compartment in rollover accidents."[22]

42.      Although the standard is not applicable to heavy pickups like the Class Vehicles, on information and belief, Ford treated FMVSS 216 as a relevant standard to consider when designing its heavier pickup trucks.

43.     In addition to FMVSS 216, in 1995, NHTSA, as part of its rule-making authority, stated with respect to passenger vehicles weighing 10,000 pounds or less, the performance standards applicable to door retention components "are intended to minimize the likelihood of occupants being ejected from the vehicle in the event of a crash."[23] NHTSA found:

---

[21] *Id*.

[22] NHTSA, Test Procedure 216-05, dated Nov. 16, 2006, available at https://www.nhtsa.gov/sites/nhtsa.gov/files/tp-216-05.pdf.

[23] NHTSA Fed. Motor Vehicle Safety Standards; Door Locks and Door Retention Components, Final Rule, 60 Fed. Reg. 50,124 (Sept. 28, 1995) (49 C.F.R. pt. 571).

> Real world crash data show that latch failures are the dominant cause of door openings and that they are seldom loaded symmetrically. Since side door latches that individually meet the requirements of Standard No. 206 have significantly reduced side door openings in crashes and have saved an estimated 400 lives per year, NHTSA has decided that the proposed requirements should be applied to each back door latch tested.

44. Although NHTSA's comment refers to back door latches (such as those on rear hatchback doors), the point of the rule is to "extend[] the standard's requirements [FMVSS 206], currently applicable only to side doors, to the back doors . . . ." (60 Fed. Reg. at 50,124). That standard, FMVSS 206, requires that a latch withstand 2,000 lbs. of force.

**C. Ford's Super Duty Roof Defect.**

45. Each Class Vehicle is part of Ford's Super Duty PHN-131 platform. Ford began its development of the PHN-131 in 1993, which culminated in 1999 when the first vehicle to include the platform was introduced in its 1999 model year Super Duty trucks.

46. The PHN-131 platform includes Ford's F-250, F-350, F-450 and F-550 Super Duty trucks. The platform is available in three cab configurations: (1) a 2-door Regular Cab; (2) a 4-door Super Cab; and (3) a traditional 4-door Crew Cab (also referred to as the "Super Crew"). The Super Cab design consists of two doors on each side that latch to one another when closed, sometimes referred to as "clam-shell" doors."



13

47.     The roof of a typical automobile with both front and back seats is supported by three pillars on each side: the A pillars at the front, on each side of the windshield, the C pillars at the back of the passenger compartment behind the rear seats, and the B pillars, between the A and C pillars and behind the front door.

48.     The Regular Cab has A and B pillars, the Super Cab only has A and C pillars, and the Crew Cab has A, B, and C pillars. In the Super Cab Class Vehicles, the two doors on each side open in opposite directions and latch to one another when closed, and consequently, do not have a fixed frame B pillar, situated between the front and rear doors.



*Regular cab (top left), Super Cab (top right), and Crew Cab (bottom)*

49.     B pillars are important structural components of an automobile roof. Use of a B pillar in a passenger compartment with both front and back seats serves to support the middle span of the side roof rail by joining it to the "rocker," the frame component that runs along the bottom of the frame, underneath the doors. The B pillar is the roof support pillar that is roughly in line with the back of the front seat of a typical pickup truck. It is the pillar to which the front door would normally latch upon closing. Instead of having a B pillar, Ford claims that the Super Cab

14

has a "floating B pillar." The supposed B pillar "floats" because, when the doors are open, the B pillar no longer exists. In order for the floating B pillar to lend structural support to the roof, the rear door of the Super Cab must be securely latched to the roof rail and rocker panel when it is closed. After the rear door is closed, the front door can be closed by means of a latch connecting it to the rear door.

50.      In a rollover event, the roof of the pickup truck will impact with the ground, causing a deformation of the roof rail, and increasing the risk of severe injury or death to passengers.

51.      The roof system installed in the Class Vehicles are defective in that they do not possess sufficient structural integrity and strength to withstand a rollover accident. What makes this more troubling is that the inadequacies in the design of the PHN-131 roof system are the result of intentional decisions by Ford to minimize costs—without regard to the serious safety risks identified by NHTSA decades earlier.

52.      On information and belief, prior to the development of the PHN 131 platform, Ford tested its heavier F-Series pickup trucks against FMVSS 216, as well as other vehicles that were over the weight limit set in the standard. But, by March 1995, Ford determined that the PHN 131 platform it was designing exceeded the weight threshold set in FMVSS 216 and decided that it would no longer subject its heavier trucks (such as the Class Vehicles) to FMVSS 216 testing.

53.      Around the same time Ford decided it would no longer test its heavier trucks pursuant to FMVSS 216, it decided to implement a handful of downgrades to roof structural components found in the Class Vehicles, including in the roof bows, the windshield header, the A pillar, and the B pillar.

54.      Among the design changes implemented between March 31, 1994 and January 5, 1998 were: (1) downgage roof bow by 20%; (2) replace high strength steel in the Super Cab rear

15

door vertical beam (the floating B-pillar) with mild steel (resulting in a $20.86 savings per vehicle); (3) deleting the front other windshield header (resulting in a savings of $3.50 per vehicle); and (4) downgage A-pillar strength by 4%.

55.     These "downgages" were implemented as part of Ford's PHN-131 cost-containment plan which reduced the company's investment in the platform by $600 million and were designed to "improve the PHN-131 financial equation."

56.     Even after the PHN-131 went into production in January 1998, Ford continued to weaken the strength of the roof, for the sole purpose of enhancing its profits. Among the design changes implemented between January 5, 1998 and June 28, 2000, were the following: (1) further downgage A-pillar strength by an additional 8.3% (resulting in a $2.42 savings per vehicle); (2) downgage Super Cab floating B-pillar strength by 20% (resulting in a savings of $0.96 per vehicle); (3) downgage inner windshield header by 11% (resulting in a savings of $0.17 per vehicle); (4) downgage roof bow by 7.5% (resulting in a savings of $0.10 per vehicle); and (5) downgage A-pillar reinforcement by 4.8% (resulting in a savings of $0.20 per vehicle).  In total, these design changes would provide Ford with $25 million in profit for every 100,000 vehicles sold.

57.     On information and belief, Ford made no design changes to offset the above downgages to the Class Vehicles' roof structure. Nor did Ford perform any physical tests consistent with FMVSS 216's testing framework to determine what effect these changes would have on roof strength and passenger safety.

58.     In 2003, after these changes, experts performed a roof crush test in accordance with the FMVSS 216 standard on a 2001 F-250 Super Cab pickup, which has a gross vehicle weight

16

rating ("GVWR") of 8,800 lbs.[24] To little surprise, the vehicle would not have satisfied the FMVSS 216 standard and recorded a result of 9,800 lbs.

59. For Super Cab Class Vehicles, the likelihood of serious injury or death is magnified by the absence of a functioning B pilar. When a Super Cab rolls over, upon impact, the upper latch on the rear door is highly susceptible to failing and becoming separated. This separation enables a void to form between the door frame and the roof rail, meaning that the B pillar was floating rather than in position during a rollover event. As a result of the non-functional B pillar, the anterior portion of the driver's head may enter this void and be crushed between the structural components during the rollover event.

60. The upper latch used by Ford to secure the top of the rear door (the floating B pillar) to the roof rail in a Super Cab is known as a D5 latch, which is far weaker and smaller than the D21 latch used at the bottom of the rear door and used to latch the front door to the rear door.

61. On information and belief, at the time Ford designed the Super Cab it understood that the D5 latch would fail well before the D21. Ford understood that strength testing on the D5 latch resulted in only 1,828 lbs. of resistance, whereas FMVSS 206 calls for at least 2,000 lbs.

62. The existence of the Roof Defect became national news on August 19, 2022, when "a jury in Georgia reached a verdict in a case involving a 2014 rollover of a Ford F-250 pickup truck that left two people dead."[25] The jury determined that the plaintiffs, two children of the deceased Class Vehicle owners, were entitled to $1.7 billion, only $24 million of which were for

---

[24] https://www.autoblog.com/buy/2001-Ford-F_250-Lariat__4x4_SD_Super_Cab_158_in._WB_HD/specs/ (last accessed Sept. 28, 2022).

[25] Nora Eckert, Roof Strength on Older Ford Trucks Called Into Question by $1.7 Billion Jury Verdict, WSJ, Aug 22, 2022, available at: https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last accessed Sept. 28, 2022).

compensatory damages. The jury based the sizeable punitive damage award on its determination that Ford sold 5.2 million Class Vehicles that it knew contained the deadly Roof Defect.

63.    Below are pictures introduced in the Georgia trial that show the complete collapse of the Class Vehicle following the rollover accident, leading to the death of two individuals:







19

**D. Ford knew that the Class Vehicles suffered from the Roof Defect but has yet to disclose and acknowledge its existence.**

64.    Ford, based on the facts alleged herein and on information and belief, had full knowledge of the existence of the Defect and the risk it posed to Class Vehicle owners and lessees. This knowledge is based upon, among other facts: (a) Ford's pre-sale durability testing and part sales; (b) records of customer complaints provided to Ford; (c) dealership repair records; (d) consumer complaints posted on the internet; (e) warranty and post-warranty claims; (f) Ford's internal investigations into the PHN-131's roof strength; and (g) product liability, wrongful death and personal injury lawsuits filed against Defendant related to the Defect in Class Vehicles.

65.    Ford is experienced in the design and manufacture of consumer vehicles. As an experienced manufacturer, Ford conducts tests, including pre-sale durability testing, on incoming components to verify the parts are free from defects, align with its specifications, and fit for their intended use.

66.    Ford claims that it puts its vehicles, including the Class Vehicles, through rigorous durability testing.[26] As part of this testing, Dave Payne, Ford's Manager-Vehicle Development Operations, states that "We're always trying to go faster and develop products faster and make 'Ford Tough' DNA tougher all the time."

67.    For example, Ford states that "prototypes of America's favorite work truck [the 2008 Ford F-Series Super Duty] logged more than 10 million miles of testing in all kinds of conditions – including nearly 3 million miles of real-world customer durability testing in some of the most extreme conditions possible" before it was sold to any customers.[27] Ford further states

---

[26] https://www.wardsauto.com/industry/ford-takes-human-element-out-vehicle-durability-test-drives (last accessed Sept. 28, 2022).

[27] https://www.reliableplant.com/Read/7966/ford-puts-vehicles-through-wide-array-of-

that its "real-world testing for all its vehicles covers a gauntlet of demanding procedures conducted

in torturous terrain" "[f]rom the bitter cold of the Arctic to the blazing heat of the Arizona desert[.]"

Further, Ford states that it conducts "a battery of lab-based tests designed to induce more damage

than the toughest customer can dole out," including:

> **Open-and-Shut Case** – If it's on a car and it opens and closes, it undergoes rigorous testing at Ford that equates to roughly 10 years of average use. Ford's Body Testing engineers load test vehicles into a mechanical fixture designed to replicate human use. For example, to test a door: A hydraulic arm reaches down, lifts the hatch, opens the door, then closes it – 84,000 times. The testing cycle also includes rolling the window up and down and locking and unlocking the doors 26,000 times. Decklids are tested to 10,000 cycles, liftgates to 25,000 cycles and hoods to 1,500. Even fuel doors are tested – opened and closed 3,000 times. Each test is performed in a sealed climatic chamber, with tests run at temperatures varying from minus-40 degrees Fahrenheit to +180 F. Tests typically last four to six weeks, depending on the complexity. If closures don't meet the standards set by Ford, they're sent back to engineering for improvement.

> **Surviving Silver Creek** – Ford's famed Silver Creek test was developed in 1977 to simulate an actual off-road trail in Northern Arizona known for its severity. This man-made surface at the company's Arizona Proving Grounds was constructed to capture the loads and damage for durability testing. Silver Creek combines two extremely rough roads – one section has 15 distinct types of bumps and chuckholes while the other is made from broken concrete pieces in a random matrix. Traveling a mere 2,000 feet on this course is the equivalent to approximately 20 miles of the original severe off-road surface.

> **Snaking Through the Sand Wash** – A deep bed of loose sand is used to test steering systems and four-wheel-drive/all-wheel-drive components on Ford, Lincoln and Mercury vehicles. It is targeted to meet the demands of customers who use their vehicles on construction sites, as well as recreational use on beaches and sand dunes. During each test event, Ford engineers tackle the 8-inch-deep sand surface driving two miles in a serpentine formation.

> **Chuckholes – Taking the Hit** – To give drivers a fighting chance against wheel and tire damage caused by less-than-perfect roads, Ford engineers have designed suspension parts to handle chuckholes as effectively as possible. Engineers tune shock rebound rates to keep wheels and tires suspended so they can glide over potholes instead of dropping down into them. To approximate the most severe conditions a Midwest customer might encounter, Ford engineers have devised a

---

torture-tests (last accessed Sept. 28, 2022).

durability test consisting of a series of 4-inch deep square-edge chuckholes with a width of up to 30 inches. A complete test sequence includes approximately 2,700 chuckhole hits for each wheel.

**Performing in a Deep Freeze** – Ford engineers have significantly improved engine cylinder head and head gasket design, thanks in part to a brutal Deep Thermal Shock test conducted at the company's Engine Laboratory in Dearborn, Mich. This abusive cold start test runs to failure or for 150 hours – whichever comes first. Vehicles withstand -22 degrees F shock for 300 cycles, going through repeated heating-to-cooling cycles. Meanwhile, engineers at the Automatic Transmission Development Laboratory in Livonia, Mich., freeze vehicle parts to -60 F, then apply maximum torsional loads. This Deep Freeze Torsional Fatigue testing is designed to ensure Ford parts survive deep thermal shock for start-ups in cold weather climates.

**Wear and Tear** – Ford's Manual Transmission Clutch Wear Test does to your clutch in 30 seconds what it would take your teenager a full year to accomplish. It was developed to ensure that heat generated by excessive clutch wear would not induce mechanical failure. The test, conducted at the Automatic Transmission Development Laboratory, applies continuous slip to a vehicle's clutch assembly until all material is disintegrated to ensure against support component failure.

**Choke Hold** – Imagine your heart beating minus the blood flow. To ensure that the transmission pump can survive momentary fluid loss, Ford engineers put vehicles through a speed, temperature and pressure matrix while draining the oil from the pump (choking). The Pump Performance with Max Durability test has vehicles endure speeds as high as 8,000 rpms with temperatures exceeding 250 degrees F as their pumps are "bled dry."

**Welcome to Curb Island** – Engineers subject Ford, Lincoln and Mercury cars and crossovers to this test inspired by an actual curb in Southeast Michigan. Curb Island simulates an expressway run-off situation in which a vehicle runs into a curb with an entry height of 5 inches and exit height of 5.5 inches at approximately 10 degrees. Approaching the curb at speed induces very high impact loads (strength-based loads) while exiting can induce complete rebound of a vehicle suspension.

**Let's Do the Twist (Ditch)** – This lab-based test simulates traversing a deep angled ditch. It's designed to ensure a vehicle can travel over washouts and across dry river beds. Twist Ditch puts the vehicle in an extreme body twist, inducing torsion by articulating the suspension to support the vehicle weight on only two opposing wheels at a time (left-front/right-rear or right-front/left-rear).

68.     As detailed above, Ford conducts extensive pre-sale analysis of all aspects of its vehicles, including the Class Vehicles' roofs.

69.     On information and belief, Ford regularly reviews and inspects the quality, durability, and safety of its vehicles. For example, "Ford engineers developed a stronger roof for its Super Duty pickups in 2004 but that roof wasn't used in trucks sold to customers until the 2017 model year[.]"[28]

70.     Ford also regularly monitors NHTSA databases for consumer complaints as part of its ongoing obligation pursuant to the TREAD Act, 49 U.S.C. § 30118, to identify potential defects in its vehicles. On information and belief, Class Vehicle owners filed numerous complaints with NHTSA relating to the Roof Defect since the first sale of the Class Vehicles.

71.     In addition to NHTSA complaints, customer complaints of the Roof Defect in Class Vehicles can be found on various consumer websites and message boards.

72.     For example, in 2005, a group of Class Vehicle owners discussed "Superduty roll over safety" and reported disturbing rollover incidents they experienced.[29] One person told the story of "a woman driving the Superduty swerved to miss an appliance box. She said she was doing 65mph. Her and her 3 kids ages 9-12 were only slightly injured. All were belted in." Another person commented: "This is an area that Ford shouldn't be proud of, it's been noted that these truck[s] are very poor when it comes to rollovers."

73.     By way of another example, on March 23, 2004, a woman named Dena Parker issued a statement on the nonprofit consumer advocacy organization Public Citizen's website.[30]

---

[28] https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last accessed Sept. 28, 2022).

[29] https://www.ford-trucks.com/forums/410840-superduty-roll-over-safety.html (last accessed Sept. 28, 2022).

[30] https://www.citizen.org/article/statement-of-dena-parker-2/ (last accessed Sept. 28, 2022).

Therein, Ms. Parker details the rollover accident in a Ford Super Duty F-250 Super Cab that left

her husband paralyzed:

> My name is Dena Parker and I live in Childress, Texas. On the morning of August 29, 2001, my life took a devastating turn when I received the call that my husband Patrick had been in an automobile accident. I learned later that his neck was broken when his Superduty Ford F250 Supercab pickup truck rolled over and crashed. Patrick was still hanging upside down, strapped in by his seatbelt, as rescuers attempted to cut him out of the crushed truck cab with the jaws of life. Patrick has been living as a quadriplegic since that morning.

> My husband worked for a utility company for 15 years. In 2001, he was assigned a new company vehicle, a 2001 Superduty F250 Supercab pickup truck. This "super heavy duty" work truck was dangerous, although its danger was hidden to us. My husband left for work early that morning while it was still dark, on his way to Wichita Falls, traveling on highway 287. About 30 minutes after he left our house, I received a phone call. The caller told me my husband had been in an accident, and when I began to panic, she told me that he had hit his head, but that he seemed fine. She said that my husband was talking to the people on the scene of the accident, and that he had given them my name and number and told them to call me. I drove to the emergency room in Quanah, Texas, where Patrick was taken. When I saw him lying there, I asked him if he was okay. I'll never forget that moment, although at the time, I could not accept it, and still to this day am in disbelief that this happened to us. He said, "No, Dena. I can't feel my legs." I started to cry, and told him it would be okay.

> I asked Patrick what happened. He told me he had hit a deer. Patrick avoided the first deer, but as he was correcting, he struck a second deer and lost control. The truck rolled. The rollover itself didn't hurt my husband. He was injured when the roof of the Ford pickup crushed in on him. His spinal cord was nearly severed when his neck was broken, rendering him a quadriplegic at the age of 37. Our lives are forever changed.

> ***

> As time passed, I began to hear other stories about other people involved in rollover accidents, some walking away, some, like my husband, not. I started researching and began to understand fully how my husband never had a chance. I learned about how the auto industry has refused to act on the knowledge and facts that they have long had, and failed to improve the "roof crush" standard, which tests the strength on only one side of a vehicle with the windshield intact to a maximum of only 1 ½ times the vehicle's weight. I also learned that if a vehicle's gross weight is more than 6,000 pounds, it doesn't have to meet any roof crush standard, although the auto maker claimed my husband's work truck did. I am not an engineer or an expert, but common sense tells me that glass will hold a great deal of pressure. Common

24

sense also tells me it will break and then be unable to hold anything. Such a test does nothing to protect anyone involved in a real rollover accident. I know now that there are foreign automakers that have testing that better simulates the circumstances involving a real rollover, thereby enabling people to walk away from rollover accidents. A rollover standard should simulate actual rollover conditions, regardless if it is a dynamic or static test. I read that Ford owns Volvo, and later found out about the Volvo XC90, which has a roof that can hold well over three times the vehicle's weight and beats our roof crush standard by more than 100 percent. If my husband had been in a vehicle such as that, he would have walked away, but my husband was driving a super heavy-duty work truck. We were shocked to find out that there are vehicles that weigh less, even passenger cars, that have thicker materials in the roof structure than that super heavy-duty F250 did. We learned that the A pillars had been downgauged (thickness of the metal for that part decreased) on two occasions, and that it also had an "open section header" connecting the A pillars, whereas even the F150 had a "closed section header." This vehicle was unreasonably dangerous and my husband never had a chance.

The auto industry has been blaming drivers for these unnecessary injuries. People hear propaganda from automakers as they watch the commercials on TV about how strong and safe their trucks and cars are built. But, the auto industry has used excuses all these years NOT to do the right thing. There is a simple solution to avoid debilitating injuries like Patrick's: Our government must protect consumers by forcing automakers to follow a tougher standard on roof strength. We have side impact tests and front bumper tests but a joke of a roof crush test.

74.     On information and belief, Ford's customer relations department, which interacts with authorized service technicians to identify potentially widespread vehicle problems and assist in the diagnosis of vehicle issues, has received numerous reports of the Roof Defect. Customer relations also collects and analyzes field data, including, but not limited to, incident reports, repair requests made at dealerships and service centers, technical reports prepared by engineers that have reviewed vehicles for which warranty coverage is requested, parts sales reports, and warranty claims data.

75.     Ford's warranty department similarly reviews and analyzes incident reports and warranty data submitted by its dealerships and authorized technicians to identify defect trends in its vehicles.

76. Ford dictates that when a repair is made under warranty (or warranty coverage is requested), service centers must provide Defendant with detailed documentation of the problem and the fix that describes the complaint, cause, and correction, and also save the broken part in case Ford later determines to audit the dealership or otherwise verify the warranty repair.

77. For their part, service centers are meticulous about providing this detailed information about in-warranty repairs to Ford because Ford will not pay the service centers for the repair if the complaint, cause, and correction are not sufficiently described.

78. Ford knew or should have known about the Roof Defect because of the high number of replacement parts for the Class Vehicle roof systems following incidents, which it is reasonable to infer were ordered from Ford. All of Ford's service centers are required to order replacement parts directly from Ford. Other independent vehicle repair shops that service Class Vehicles also order replacement parts directly from Ford.

79. Ford routinely monitors part sales reports and are responsible for shipping parts requested by dealerships and technicians. Thus, Ford has detailed, accurate, and real-time data regarding the number and frequency of replacement part orders. The increase in orders of auto-parts necessary to fix damage caused by the Roof Defect of the Class Vehicles was known to Defendant and should have alerted it to the scope and severity of the Defect.

80. On information and belief, Ford's customer relations division regularly receive and respond directly to customer calls concerning, *inter alia*, product defects. Through these sources, Defendant was made aware of the Defect and had knowledge of its potential danger.

81.     Ford also would have learned of the Roof Defect through the scores of lawsuits filed against it. Evidence uncovered in the *Hill* action revealed that there have been at least 162 lawsuits and 83 incidents of the roof crush involving the 1999-2016 Super Duty trucks.[31]

82.     On information and belief, Ford conducted extensive internal investigations into the PHN-131's roof strength after learning of rollover accidents in the Class Vehicles through the above sources.

**E.  Ford has yet to recall the Class Vehicles and warn drivers of the Roof Defect.**

83.     Auto manufacturers are required to file a report with NHTSA within five days of identifying any safety related defects in its vehicles. 49 C.F.R. § 573 *et seq*. The initial report is required to identify all vehicles "potentially containing the defect" and include "a description of the manufacturer's basis for its determination of the recall population and a description of how the vehicles or items of equipment to be recalled differ from similar vehicles or items of equipment that the manufacturer has not included in the recall." *Id*. § 573.6. Additionally, the report must contain a "description of the defect" and "identify and describe the risk to motor vehicle safety reasonably related to the defect[.]" *Id*.

84.     The purpose of these regulations is obvious: "To facilitate the notification of owners of defective and noncomplying motor vehicles …, and the remedy of such defects and noncompliances, by equitably apportioning the responsibility for safety-related defects and noncompliances with Federal motor vehicle safety standards among manufacturers of motor vehicles[.]" *Id*. § 573.2.

---

[31] https://www.wsj.com/articles/ford-faces-1-7-billion-verdict-in-fatal-rollover-of-f-250-pickup-11661033662 (last accessed Sept. 28, 2022).

85.     Despite years of deadly rollover accidents involving the Class Vehicles, and resulting lawsuits, Ford continues to deny the existence of the Roof Defect and has yet to warn drivers that their lives are disproportionally at risk each time they operate their vehicles.

## V.     TOLLING OF STATUTES OF LIMITATIONS

65.     Any applicable statute(s) of limitations have been tolled by Defendant's knowing and active concealment and denial of the facts alleged herein. Plaintiff and the members of the Class could not have reasonably discovered the true nature of the Roof Defect because Defendant concealed it. Plaintiff's claims were thus tolled pursuant to the discovery rule, for fraudulent concealment, and for estoppel.

### A.  Discovery Rule

66.     The causes of action alleged herein did not accrue until Plaintiff and Class Members discovered that their Class Vehicles contained the Defect.

67.     As alleged above, Class Members had no way of knowing about the Roof Defect in their Class Vehicles. Defendant concealed its knowledge of the Defect while it continued to market and sell the Class Vehicles as safe, secure, high-quality, and reliable vehicles. To this day, Defendant failed to disclose the full extent of the Defect and the risks faced by Class Vehicle passengers.

68.     Within any applicable statutes of limitation, Class Members could not have discovered through the exercise of reasonable diligence that Defendant was concealing the conduct complained of herein and misrepresenting the true qualities of the Class Vehicles.

69.     Class Members did not know facts that would have caused a reasonable person to suspect that there was a Roof Defect affecting their vehicle and an ordinary person would be unable to appreciate that the vehicle was defective.

70.     For these reasons, all applicable statutes of limitation have been tolled by operation of the discovery rule with respect to the claims in this litigation.

**B. Fraudulent Concealment**

71.     As the manufacturers, distributors, sellers, and/or warrantors of the Class Vehicles, Defendant was under a continuous duty to disclose to Class Members the existence of the Defect found in the Class Vehicles.

72.     Defendant was and remains under a continuing duty to disclose to Plaintiff and the Members of the Class the true character, quality, and nature of the Class Vehicles, that the Roof Defect found in the Class Vehicles fails to protect passengers from severe physical injury or death in the event of a rollover accident and diminishes the resale value of the Class Vehicles.

73.     Defendant recklessly disregarded the true nature, quality, and character of the Class Vehicles, by failing to disclose the existence of the Roof Defect.

74.     Due to Defendant's concealment throughout the time period relevant to this action, all applicable statutes of limitation have been tolled.

75.     Instead of publicly disclosing the Defect in the Class Vehicles, Defendant kept owners and lessees in the dark about the Defect present in its vehicles. To this day, Defendant has knowingly or recklessly failed to disclose the full extent of the Defect and has failed to offer adequate remedies for the Defect.

76.     Class Members were not at fault for failing to discover the existence of the Defect present in their Class Vehicles.

77.     Plaintiff had no actual or presumptive knowledge of facts sufficient to put them on inquiry notice of the existence of the Roof Defect. In particular, Class Members did not possess the aggregate data concerning roof collapses involving Class Vehicles or the technical data related to the design of the Class Vehicles. Moreover, Defendant has gone to great efforts to ensure that

the prevalence and extent of injuries caused by the Roof Defect do not enter public knowledge. Among the ways Ford has accomplished this is through entering into confidential settlements with victims of the Roof Defect.[32]

78.     This ignorance of the existence of the Defect present in the Class Vehicles is common across Plaintiff and each Class Member.

**C.  Estoppel**

79.     Defendant was, and is, under a continuous duty to disclose to Plaintiff and Class Members the true character, quality, and nature of the Class Vehicles.

80.     Defendant knowingly downgraded the strength of the roof systems in the Class Vehicles to maximize profits, at the direct expense of Plaintiff's and each Class Member's safety.

81.     Defendant failed to disclose the existence of the Defect and actively concealed the true character, quality, and nature of the Class Vehicles while knowingly making representations about the safety, quality, and reliability of the Class Vehicles. Plaintiff and Class Members reasonably relied upon Defendant's knowing and affirmative representations and/or active concealment of these facts. Based on the foregoing, Defendant is estopped from relying on any statutes of limitation in defense of this action.

**VI.  CLASS ALLEGATIONS**

82.     Plaintiff brings this action pursuant to Rules 23(a), 23(b)(2), and 23(b)(3) of the Federal Rules of Civil Procedure on behalf of themselves and all others similarly situated.

83.     Plaintiff seeks to represent a class ("Nationwide Class") defined as:

---

[32] *See* Hannah Albarazi, *Ford's $1.7B Trial Loss Puts Spotlight On Hush Deals, Ga. Law*, Law360, Aug. 26, 2022, available at https://www.law360.com/articles/1523787/ford-s-1-7b-trial-loss-puts-spotlight-on-hush-deals-ga-law ("Over the last two decades, I have had quite a few of these [lawsuits] that were resolved for amounts that were confidential at Ford's request").

All persons or entities in the United States who purchased or leased a model year 1999-2016 Ford Super Duty vehicle, including the F-250, F-350, F-450 and F-550.

84.     In addition, and in the alternative to the Nationwide Class, Plaintiff seeks to represent a class ("Illinois Class"), defined as:

All persons or entities in the United States who purchased or leased a model year 1999-2016 Ford Super Duty vehicle, including the F-250, F-350, F-450 and F-550, in the state of Illinois.

85.     The Nationwide Class and the Illinois Class are collectively referred to herein as the Classes.

86.     Excluded from the Classes are Defendant, its affiliates, employees, officers and directors, persons or entities that purchased Class Vehicles for resale, and the Judge(s) assigned to this case. Plaintiff reserves the right to modify, change, or expand the Classes' definitions based on discovery and further investigation.

87.     <u>Numerosity</u>: Upon information and belief, the Classes are so numerous that joinder of all members is impracticable. While the exact number and identities of individual members of the Classes are unknown at this time, such information being in the sole possession of Defendant and obtainable by Plaintiff only through the discovery process, Plaintiff believes, and on that basis alleges, that at least 5.2 million Class Vehicles have been sold and leased in the United States.

88.     <u>Existence and Predominance of Common Questions of Fact and Law</u>: Common questions of law and fact exist as to all members of the Classes. These questions predominate over the questions affecting individual Class Members. These common legal and factual questions include, but are not limited to:

a.   whether the Class Vehicles were sold with the Roof Defect;

b.   whether Defendant engaged in the conduct alleged herein;

31

c. whether Defendant advertised, marketed, distributed, leased, sold, or otherwise placed the Class Vehicles into the stream of commerce in the United States;

d. whether Defendant knew of the Roof Defect but failed to disclose the problem and its consequences to its customers;

e. whether a reasonable consumer would consider the Roof Defect or its consequences to be material;

f. when Defendant discovered the Roof Defect in the Class Vehicles, and what, if anything, it did in response;

g. whether Defendant should be required to fully disclose the existence of the Roof Defect;

h. whether Defendant breached its implied warranties with respect to the Class Vehicles;

i. whether Plaintiff and Class members overpaid for their Class Vehicles;

j. whether Defendant was unjustly enriched; and

k. whether Plaintiff and Class members experienced losses as a result of the Roof Defect, and if so, how much.

89. <u>Typicality</u>: Plaintiff's claims are typical of the claims of the Classes because Plaintiff purchased the Class Vehicle with the same Defect as did each member of the Classes. Furthermore, Plaintiff and all Members of the Classes sustained monetary and economic injuries including, but not limited to, ascertainable losses arising out of Defendant's wrongful conduct. Plaintiff is advancing the same claims and legal theories on behalf of himself and all absent Class Members.

90.     Adequacy: Plaintiff is an adequate representative because Plaintiff's interests do not conflict with the interests of the Classes that Plaintiff seeks to represent, Plaintiff has retained counsel competent and highly experienced in complex class action litigation, and they intend to prosecute this action vigorously. The interests of the Classes will be fairly and adequately protected by Plaintiff and his counsel.

91.     Superiority: A class action is superior to all other available means of fair and efficient adjudication of the claims of Plaintiff and Members of the Classes. The injury suffered by each individual Class member is relatively small in comparison to the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendant's conduct. It would be virtually impossible for Members of the Classes individually to redress effectively the wrongs done to them. Even if the Members of the Classes could afford such individual litigation, the court system could not. Individualized litigation presents a potential for inconsistent or contradictory judgments. Individualized litigation increases the delay and expense to all parties, and to the court system, presented by the complex legal and factual issues of the case. By contrast, the class action device presents far fewer management difficulties, and provides the benefits of single adjudication, an economy of scale, and comprehensive supervision by a single court. Upon information and belief, members of the Class can be readily identified and notified based on, *inter alia*, Defendant's vehicle identification numbers, warranty claims, registration records, and database of complaints.

92.     Defendant has acted, and refused to act, on grounds generally applicable to the Classes, thereby making appropriate final equitable relief with respect to the Classes as a whole.

## VII.    CAUSES OF ACTION

### COUNT I
### VIOLATION OF THE MAGNUSON-MOSS WARRANTY ACT
(15 U.S.C. § 2301, *et seq*.)
(On behalf of the Nationwide Class)

93.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

94.    Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class.

95.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332(a)-(d).

96.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). Plaintiff and Nationwide Class members are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its implied warranties.

97.    Ford is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

98.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with an implied warranty.

99.    Ford provided Plaintiff and Nationwide Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson- Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Ford warranted that the Class Vehicles were fit for their ordinary purpose and would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

34

100.     Ford breached its implied warranties, as described herein, and is therefore liable to Plaintiff under 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common defect in that they are all equipped with a defect in design and manufacturing of the roof system that makes the vehicles unsafe in the event of a rollover accident, causing an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Class Vehicles. The Roof Defect rendered the Class Vehicles unmerchantable and unfit for their ordinary use of driving when they were sold or leased, and at all times thereafter.

101.     As discussed herein, on information and belief, Ford knew or should have known about the Roof Defect from its purposeful "downgrades" to the strength and safety of the roof systems in the Class Vehicles before launching the Class Vehicles. Ford omitted information about the Roof Defect and its consequences from Plaintiff and Class Members, misrepresented the qualities of the Class Vehicles, and has failed to provide a fix for the Defect.

102.     Any effort by Ford to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim or otherwise limit such liability is null and void.

103.     Any limitations Ford might seek to impose on its warranties are procedurally unconscionable. There was unequal bargaining power between Ford and Plaintiff, because, at the time of purchase and lease, Plaintiff had no other options for purchasing warranty coverage other than directly from Ford.

104.     Any limitations Ford might seek to impose on its warranties are substantively unconscionable. Ford knew or should have known that the Class Vehicles were defective and that the Class Vehicles could cause grave injuries or death when used as intended long before Plaintiff and Class Members knew or should have known. Ford failed to disclose this defect to Plaintiff and

Class Members. Thus, enforcement of the durational limitations on the warranties is harsh and would shock the conscience.

105. Plaintiff has had sufficient direct dealings with either Ford or its agents (dealerships) to establish privity of contract between Ford and Plaintiff. Nonetheless, privity is not required here because Plaintiff is an intended third-party beneficiary of contracts between Ford and its dealers, and specifically, of Ford's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the defect, as the Roof Defect presents an unreasonable risk of death, serious bodily harm, and property damage to owners and lessees of the Class Vehicles.

106. Under 15 U.S.C. § 2310(e), Plaintiff is entitled to bring this class action and is not required to give Ford notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiff under Rule 23 of the Federal Rules of Civil Procedure.

107. Plaintiff would suffer economic hardship if he returned his Class Vehicle but did not receive the return of all payments made by him. Because Ford will not acknowledge any revocation of acceptance and immediately return any payments made, Plaintiff has not re-accepted his Class Vehicle by retaining it.

108. The amount in controversy of Plaintiff's individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed based on all claims to be determined in this lawsuit. Plaintiff, individually and on behalf of all other Nationwide Class members, seeks all damages permitted by law, including diminution in value of the Class Vehicles, in an amount to be proven at trial. In

addition, under 15 U.S.C. § 2310(d)(2), Plaintiff is entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiff and Nationwide Class members in connection with the commencement and prosecution of this action.

109.     Plaintiff also seeks the establishment of a Ford-funded program for Plaintiff and Nationwide Class members to recover out-of-pocket costs incurred in attempting to rectify and mitigate the effects of the Roof Defect in their Class Vehicles.

### COUNT II
### FRAUDULENT CONCEALMENT
(Common law)
(On behalf of the Nationwide Class, or, in the alternative, on behalf of the Illinois Class)

110.     Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

111.     Plaintiff brings this claim on behalf of himself and the Nationwide Class under the common law of fraudulent concealment (or "fraud by concealment"), which is materially uniform in all states. In the alternative, Plaintiff brings this claim on behalf of the Illinois Class under the laws of Illinois.

112.     A nationwide class is appropriate because the elements of a fraudulent concealment claim are virtually identical in all states. In all states, Plaintiff can prevail by showing that: (i) Ford had a duty to disclose material facts in connection with the sale or lease of the Class Vehicles; (ii) Ford either (a) knowingly made a false representation concerning material information in connection with the sale or lease of the Class Vehicles; (b) knowingly concealed material information in connection with the sale or lease of the Class Vehicles; or (c) knowingly failed to disclose material information in connection with the sale or lease of the Class Vehicles; and (iii)

as a result of Ford's conduct, Plaintiff suffered economic damages. Ford concealed and suppressed material facts concerning the serious safety defects in Plaintiff's vehicle.

113.    Ford sold the Class Vehicle to Plaintiff without disclosing the Roof Defect and concealed and suppressed the defect from regulators and consumers.

114.    Ford concealed and suppressed the Roof Defect with the intent to deceive Plaintiff.

115.    Ford did so to falsely assure purchasers, lessees, and owners of the Class Vehicles that the vehicles they were purchasing or leasing were safe and reliable and would live up to the performance characteristics associated with the Ford brand, and then to avoid the cost and negative publicity of a recall. The concealed information was material to consumers, both because it concerned the quality, safety, and performance of the Class Vehicles and because the information would have significantly decreased the value and sales price of the vehicles.

116.    Ford had a duty to disclose the Roof Defect because it was known and only knowable by Ford; Ford had superior knowledge and access to the facts; and Ford knew the facts were not known to, or reasonably discoverable by, Plaintiff. Ford also had a duty to disclose because it made many affirmative representations about the safety, durability, and quality of the Class Vehicles, as set forth above; these representations were misleading, deceptive, and incomplete without the disclosure of the Roof Defect. Finally, once the Class Vehicles were on the road, Ford had a duty to monitor the Class Vehicles under the TREAD Act and implementing regulations, including the duty to promptly notify consumers of known safety defects.

117.    Ford concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt Ford's image and cost Ford money, and it did so at the expense of Plaintiff and the Nationwide Class.

118. On information and belief, Ford has still not made full and adequate disclosure and continues to defraud Plaintiff and the Nationwide Class and conceal material information regarding the Roof Defect.

119. Plaintiff was unaware of these omitted material facts and would not have acted as he did if he had known of the concealed and/or suppressed facts, in that he would not have purchased his Class Vehicle if he knew of the Roof Defect. Plaintiff's actions were justified. Ford was in exclusive control of the material facts and such facts were not known to the public, including Plaintiff.

120. Because of the concealment and/or suppression of the facts, Plaintiff and other class members sustained damage. In purchasing his Class Vehicle, Plaintiff did not get the benefit of his bargain since the vehicle was worth less than it would have been without the defect, and because he owns a vehicle that diminished in value as a result of Ford's concealment of, and failure to timely disclose and remedy, the defect. Had Plaintiff been aware of the concealed defects that existed in the Class Vehicles, Plaintiff would have paid less for his vehicle or would not have purchased it at all.

121. Accordingly, Ford is liable to Plaintiff and the Nationwide Class for damages in an amount to be proven at trial.

122. Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiff's and class members' rights and well-being to enrich Ford. Ford's conduct warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT III
## UNJUST ENRICHMENT
(Common law)
(On behalf of the Nationwide Class, or, in the alternative, on behalf of the Illinois Class)

123.    Plaintiff realleges and incorporate by reference all preceding allegations as though fully set forth herein.

124.    Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class, or, in the alternative, on behalf of the Illinois Class. A Nationwide Class is appropriate because the elements of unjust enrichment are uniform in all states.

125.    This claim is pleaded in the alternative to the contract-based claims brought on behalf of Plaintiff and the Nationwide Class.

126.    Ford has received and retained a benefit from Plaintiff and each Class Member and inequity has resulted.

127.    Ford has benefitted from selling, leasing, and distributing the Class Vehicles for more than they were worth because of Ford's conduct described herein, at a profit, and Plaintiff and putative class members have overpaid for the Class Vehicles.

128.    Thus, Plaintiff and the Nationwide Class conferred a benefit on Ford.

129.    It is inequitable for Ford to retain these benefits.

130.    Plaintiff and Nationwide Class members were not aware of the true facts about the Class Vehicles and did not benefit from Ford's conduct described herein.

131.    Ford knowingly accepted the benefits of its unjust conduct.

132.    As a result of Ford's conduct, the amount of its unjust enrichment should be determined in an amount according to proof.

## COUNT IV
## BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(UCC § 2-314)
(On Behalf of the Nationwide Class)

133.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

134.    Plaintiff brings this claim individually and on behalf of the other members of the Nationwide Class for breach of implied warranty pursuant to Uniform Commercial Code ("UCC") § 2-314.

135.    Defendant is a "merchant," a "seller," and "lessor" of motor vehicles under the UCC.

136.    Ford was, at all relevant times, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased.

137.    The Class Vehicles were not merchantable when sold or leased because they contain the Roof Defect and pose an unreasonable risk of injury or death due to the Roof Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with the Roof Defect that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of death, serious bodily harm, and property damage to lessees and owners of the Class Vehicles. This Defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

138.    Ford breached the implied warranty of merchantability by selling Class Vehicles containing a defect leading to grave risk of injury or death during ordinary operating conditions. This defect has deprived Plaintiff and Nationwide Class Members of the benefit of their bargain.

139.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above. Ford had actual knowledge of the Roof Defect, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Nationwide Class. Ford was provided notice of these issues through, *inter alia*, warranty claims and lawsuits related to the Defect before or within a reasonable amount of time after the allegations of the Defect became public. Plaintiff, individually and on behalf of the Classes, also notified Ford of the Roof Defect and the breach of warranty alleged herein through a notice letter, dated September 29, 2022. Notice of breach, however, is not required because Plaintiff and Nationwide Class members did not purchase their automobiles directly from Ford.

140.    Plaintiff and other Nationwide Class members have had sufficient direct dealings with either Defendant or its agents (*e.g.*, dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Defendant was also aware that the ultimate consumers of the Class Vehicles (*i.e.*, the Class) required vehicles that would function safely, could be relied upon, and otherwise meet minimum industry standards. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the

marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

141.    As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Nationwide Class members have been damaged in an amount to be proven at trial.

142.    Plaintiff, on behalf of himself and the Class, seeks monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

### COUNT V
### BREACH OF IMPLIED WARRANTY OF MERCHANTABILITY
(810 ILL. COMP. STAT. 5/2-314, 810 ILL. COMP. STAT. 5/2A-212)
(On Behalf of the Illinois Class)

143.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

144.    Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class.

145.    Ford is a "merchant" (as defined by 810 ILL. COMP. STAT. 5/2-104(1)), a "seller" (as defined by 810 ILL. COMP. STAT. 5/2-103(1)(d)), and a "lessor" (as defined by 810 ILL. COMP. STAT. 5/2A-103(1)(p)) of Class Vehicles.

146.    The Class Vehicles are "goods" (as defined by 810 ILL. COMP. STAT. 5/2-105(1) and 810 ILL. COMP. STAT. 5/2A-103(h)).

147.    Pursuant to 810 ILL. COMP. STAT. 5/2-314(1), "a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind."

148.    Pursuant to 810 ILL. COMP. STAT. 5/2A-212(1), "a warranty that the goods will be merchantable is implied in a lease contract if the lessor is a merchant with respect to goods of that kind."

149.    Goods are merchantable if they are "fit for the ordinary purposes for which such goods are used" and "conform to the promises or affirmations of fact made on the container or label if any." 810 ILL. COMP. STAT. 5/2-314(2)(c), (f); 810 ILL. COMP. STAT. 5/2A-212(2)(c), (f).

150.    Ford was, at all relevant times, the manufacturer, distributor, warrantor, and/or seller of the Class Vehicles. Ford knew or had reason to know of the specific use for which the Class Vehicles were purchased.

151.    The Class Vehicles were not merchantable when sold or leased because they contain the Roof Defect and pose an unreasonable risk of injury or death due to the Roof Defect as described herein. Without limitation, the Class Vehicles share a common defect in that they are all equipped with the Roof Defect that makes the vehicles susceptible to the roof crushing in a rollover accident, causing an unreasonable risk of death, serious bodily harm, and property damage to lessees and owners of the Class Vehicles. This Defect renders the Class Vehicles when sold or leased and at all times thereafter, unmerchantable and unfit for their ordinary use of driving.

152.    Ford breached the implied warranty of merchantability by selling Class Vehicles containing a defect leading to grave risk of injury or death during ordinary operating conditions. This defect has deprived Plaintiff and Illinois Class Members of the benefit of their bargain.

153.    Ford was provided notice of the issues raised in this Count and this Complaint, as detailed above. Ford had actual knowledge of the Roof Defect, and wrongfully and fraudulently concealed these material facts from Plaintiff and the Illinois Class. Ford was provided notice of these issues through, *inter alia*, warranty claims and lawsuits related to the Defect before or within a reasonable amount of time after the allegations of the Defect became public. Plaintiff, individually and on behalf of the Classes, also notified Ford of the Roof Defect and the breach of

warranty alleged herein through a notice letter, dated September 29, 2022. Notice of breach, however, is not required because Plaintiff and Illinois Class members did not purchase their automobiles directly from Ford.

154.     Plaintiff and other Illinois Class members have had sufficient direct dealings with either Defendant or its agents (*e.g.*, dealerships, consumer affairs departments, and technical support) to establish privity of contract between Defendant on one hand, and Plaintiff and each of the other Class members on the other hand. Nonetheless, privity is not required here because Plaintiff and each of the other Class members are intended third-party beneficiaries of contracts between Defendant and its dealers, and specifically, of Defendant's implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit the consumers only. Defendant was also aware that the ultimate consumers of the Class Vehicles (*i.e.*, the Class) required vehicles that would function safely, could be relied upon, and otherwise meet minimum industry standards. Additionally, privity is excused here because Plaintiff and each of the other Class members relied on statements made by Defendant itself in choosing to purchase or lease a Class Vehicle. As alleged herein, the marketing of the Class Vehicles was uniform, and was controlled and disseminated directly by Defendant.

155.     As a direct and proximate result of Defendant's breach of the implied warranty of merchantability, Illinois Class members have been damaged in an amount to be proven at trial.

156.     Plaintiff, on behalf of himself and the Class, seeks monetary damages, costs, attorneys' fees, and such other and further relief provided by law and equity.

## COUNT VI
## VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT AND CONSUMER FRAUDS ACT
(815 ILL. COMP. STAT. §505/1 *et seq.*)
(On Behalf of the Illinois Class)

157.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

158.    Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class.

159.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits unfair or deceptive acts or practices in connection with any trade or commerce, "including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILL. COMP. STAT. 505/2. The Illinois CFA also prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

160.    Ford has violated the Illinois CFA's prohibition on deceptive conduct in that it used unconscionable business practices by failing to disclose to Plaintiff and other members of the Class, in its public statements touting the safety of the Class Vehicles including at the point of sale, that the Class Vehicles contain the Roof Defect.

161.    As a direct and proximate result of Ford's conduct, Plaintiff and other members of the Class have been harmed in that they purchased Class Vehicles they otherwise would not have; paid more for Class Vehicles than they otherwise would have; and are left with Class Vehicles of diminished value and utility because of the Defect. Meanwhile, Ford has sold more Class Vehicles

than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

162.    Plaintiff seeks damages and appropriate equitable relief, including an Order requiring Ford to adequately disclose and repair the Defect, and an Order enjoining Ford from incorporating the Defect into its vehicles in the future.

163.    Based on the foregoing, Plaintiff and the Class are entitled to all remedies available pursuant to the Illinois CFA, including refunds, actual damages, liquidated damages, punitive damages, attorneys' fees, and other reasonable costs. Plaintiff and the Class also request that the Court award equitable relief, including an Order requiring Ford to adequately disclose and repair the Defect and an Order enjoining Ford from incorporating the Defect into its vehicles in the future.

**COUNT VII**
**VIOLATIONS OF THE ILLINOIS CONSUMER FRAUD AND DECEPTIVE BUSINESS PRACTICES ACT**
(815 ILL. COMP. STAT. § 505/1 *et seq*.)
(On Behalf of the Illinois Class)

164.    Plaintiff realleges and incorporates by reference all preceding allegations as though fully set forth herein.

165.    Plaintiff brings this claim individually and on behalf of the other members of the Illinois Class.

166.    The Illinois CFA prohibits unfair or deceptive acts or practices in connection with any trade or commerce, "including but not limited to the use or employment of any deception fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILL. COMP. STAT. 505/2. The Illinois CFA also prohibits suppliers from representing that their goods are of a particular quality or grade they are not.

47

167.    As alleged more fully herein, Ford has violated Illinois' prohibition on unfair conduct because its acts, omissions, policies, and course of conduct: (a) offend public policy; (b) are immoral, unethical, oppressive, and unscrupulous; and (c) cause substantial injury to consumers in violation of the Illinois CFA. *Robinson v. Toyota Motor Credit Corp.*, 201 Ill. 2d 403, 417 (2002). Its unfair business practices include failing to disclose, at the point of sale or otherwise, that the Class Vehicles contain the Roof Defect and pose a safety hazard.

168.    As a direct and proximate result of Ford's conduct, Plaintiff and other members of the Class have been harmed in that they purchased Class Vehicles they otherwise would not have; paid more for Class Vehicles than they otherwise would have; and are left with Class Vehicles of diminished value and utility because of the Defect. Meanwhile, Ford has sold more Class Vehicles than it otherwise could have and charged inflated prices for Class Vehicles, unjustly enriching itself thereby.

169.    Plaintiff seeks damages and appropriate equitable relief, including an Order requiring Ford to adequately disclose and repair the Defect, and an Order enjoining Ford from incorporating the Defect into its vehicles in the future.

170.    Based on the foregoing, Plaintiff and the Class are entitled to all remedies available pursuant to the Illinois CFA, including refunds, actual damages, liquidated damages, punitive damages, attorneys' fees, and other reasonable costs. Plaintiff and the Class also request that the Court award equitable relief, including an Order requiring Ford to adequately disclose and repair the Defect and an Order enjoining Ford from incorporating the Defect into its vehicles in the future.

## VIII.    REQUEST FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of members of the Class, respectfully request that this Court:

a.    Certify this action as a class action, proper and maintainable pursuant to Rule 23 of the Federal Rules of Civil Procedure; declare that Plaintiff is a proper class representative; and appoint Plaintiff's counsel as Class Counsel;

b.    Declare that any applicable statutes of limitations are tolled due to Defendant's fraudulent concealment and that Defendant is estopped from relying on any statutes of limitations in defense;

c.    Grant appropriate injunctive and/or declaratory relief, including, without limitation, an order that requires Defendant to repair and/or recall the Class Vehicles and to extend the applicable warranties to a reasonable period of time, or, at a minimum, to provide Plaintiff and Class Members with appropriate curative notice regarding the existence and cause of the Defect;

d.    Award Plaintiff and Class Members actual, compensatory, general, special, incidental, statutory, punitive, and consequential damages, costs, and disgorgement in an amount to be determined at trial;

e.    Award to Plaintiff the costs and disbursements of the action, along with reasonable attorneys' fees, costs, and expenses;

f.    Award pre- and post-judgment interest at the maximum legal rate;

g.    Grant leave to amend this Complaint to conform to the evidence produced in discovery and at trial; and

h.    Grant all such other relief as is just and proper.

## IX. DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial on all claims so triable.

Dated: October 6, 2022

By: _/s/ Elizabeth A. Fegan_
Elizabeth A. Fegan
FEGAN SCOTT LLC
150 S. Wacker Dr., 24th Floor
Chicago, IL 60606
Phone: 312.741.1019
Fax: 312.264.0100
beth@feganscott.com

Jonathan D. Lindenfeld
(_pro hac vice_ forthcoming)
FEGAN SCOTT LLC
140 Broadway, 46th Floor
New York, NY 10005
Phone: 332.216.2101
Fax: 312.264.0100
jonathan@feganscott.com

J. Barton Goplerud
SHINDLER,          ANDERSON,
GOPLERUD & WEESE PC
5015 Grand Ridge Drive, Suite 100
West Des Moines, IA 50265
Telephone: (515) 223-4567
E-mail: goplerud@sagwlaw.com

_Attorneys for Plaintiff and
Proposed Class Counsel_